# United States Court of Appeals
## For the First Circuit

No. 05-1698

UNITED STATES,

Appellee,

v.

OLADIMEJI O. ALLI,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, U.S. District Judge]

Before

Boudin, Chief Judge,
Stahl, Senior Circuit Judge,
and Howard, Circuit Judge.

Kevin J. Fitzgerald, Assistant Federal Defender, for appellant.
Donald C. Lockhart, Assistant United States Attorney, with whom Zechariah Chafee, Assistant United States Attorney, and Robert Clark Corrente, United States Attorney, were on brief, for appellee.

April 7, 2006

**STAHL**, **Senior Circuit Judge**.  Oladimeji Alli, a former employee of the United States Postal Service, pleaded guilty to mail theft after he was caught stealing letters containing credit cards.  Alli admitted that he had intended to send the cards to a contact in the Netherlands in exchange for money.  He was sentenced to 21 months in prison.  In this appeal, Alli raises several challenges to the way his sentence was calculated.  After careful consideration, we affirm the sentence.

## I.

In December 2003, Alli was a temporary employee at a branch of the United States Post Office in Providence, Rhode Island.  His duties included sorting bulk mail.  On December 30, 2003, Alli dropped off a package, addressed to a destination in the Netherlands, at a United Parcel Service (UPS) facility in Warwick, Rhode Island.  Finding the package suspicious, UPS workers opened it, discovered nine credit cards in nine different names, and then called the state police.  The police, in turn, called the post office where Alli worked to inquire about Alli, whose return address was on the Netherlands-bound package.  Postal Service inspectors began watching Alli at work, and in January 2004 they saw him take letters from a mail tray and hide them.  Two days later, an inspector placed about 25 letters containing credit cards onto Alli's mail tray.  While the inspectors watched and a video camera recorded, Alli pocketed two letters containing credit cards.

-2-

Moments later, an inspector confronted Alli and escorted him to a conference room where police officers were waiting.

After receiving Miranda warnings, Alli admitted stealing the two letters with the intention to take credit cards from them. He also admitted that he had stolen the nine credit cards found in the UPS package by removing them from letters he had taken from mail trays with the intention of sending the purloined cards to contacts in the Netherlands, who had promised to pay him for the cards.[1] In a later search of Alli's apartment, the police found still another credit card, which Alli also admitted to having stolen. In April 2004, Alli was charged with postal theft in violation of 18 U.S.C. § 1709. He pleaded guilty and was sentenced in April 2005[2] to 21 months in prison.

---

[1]The parties dispute whether Alli was to receive $150 for each credit card he passed along to his contacts, or whether he would get a single $150 payment for all the cards. Alli maintains, and the prosecution version of the facts in the Pre-Sentence Investigation Report implies, that Alli was to receive $150 for all of the cards. However, at Alli's sentencing hearing, the district court noted twice, without objection, that Alli was expecting $150 per card. For reasons discussed later in this opinion, we conclude that it makes no difference whether Alli would have received upwards of $1000 or only $150 for the credit cards he stole.

[2]The sentencing had originally been scheduled for October 2004, but the district court postponed the hearing until December in the hope that the Supreme Court would decide the pending case of United States v. Booker. In December, the judge allowed Alli to withdraw his guilty plea for reasons not bearing on this appeal. Alli subsequently pleaded guilty again to the same charge and was ultimately sentenced in April 2005. Booker had been decided on January 12, 2005.

The district judge presiding over Alli's sentencing hearing understood that he was operating under an advisory Guidelines system.[3] To calculate the sentence, he began with a base offense level of six,[4] to which he added an eight-level enhancement pursuant to USSG § 2B1.1(b)(1)(E) because the loss occasioned by Alli's offense was more than $70,000 but less than $120,000. The judge then added a separate two-level enhancement after concluding that Alli's offense involved "the production or trafficking of any unauthorized access device or counterfeit access device." § 2B1.1(b)(9)(B). On appeal, Alli contests the eight-level enhancement, arguing that the district court improperly calculated the amount of financial loss caused by his offense. He also challenges the two-level enhancement on the ground that § 2B1.1(b)(9)(B) does not simply require "trafficking" in a general sense, but rather the violation of a specific federal statute criminalizing the trafficking of credit cards, 18 U.S.C. § 1029(e)(5). Finally, Alli contends that his sentence is unreasonable and therefore must be vacated under the post-Booker "reasonableness" standard of review.

---

[3]The judge stated, "[A]s in all sentences since Booker, it's a two-step process. The first step is to determine what the sentence would be under the guidelines, and since Booker makes it clear that the guidelines are now advisory, the second step is to determine what a reasonable sentence would be under the statute, under [§] 3553(a), I believe it is."

[4]Both the probation office and the district court relied on the November 2003 version of the Sentencing Guidelines Manual.

We review a district court's interpretation and application of the federal Sentencing Guidelines de novo, United States v. Robinson, 433 F.3d 31, 35 (1st Cir. 2005), but review the court's related factual findings, including its calculation of loss amount, for clear error. See United States v. Flores-Seda, 423 F.3d 17, 20 (1st Cir. 2005).

**A. Amount of Loss**

Section 2B1.1(b)(1) calls for a sentencing court to increase an offender's offense level in larceny and theft cases according to the amount of loss resulting from the offense. An application note to that guideline states that "loss is the greater of actual loss or intended loss." § 2B1.1, cmt. n.3(A). All agree that no actual loss occurred as a result of Alli's theft. Therefore, the district court calculated intended loss and did so by adding together the credit limits of the stolen credit cards, arriving at a total of $88,500.[5] This was the same amount

---

[5]It appears that of the twelve credit cards Alli stole (nine in the UPS package, two at the post office, and one found in his apartment), the credit limits of only eight or nine cards were used to calculate the intended loss. The record does not reveal why this is so.

It is also worth noting that Alli was only charged with, and only pled guilty to, theft of the two credit cards with which he was caught by investigators at the post office. Counsel for Alli argued below that it was only appropriate to count the credit limits of those two cards when assessing loss, but the district court disagreed and Alli does not press the question on appeal.

recommended by the probation officer who prepared Alli's Pre-Sentence Investigation Report (PSR).

Alli timely objected to the loss calculation in the PSR and renewed his objection at his sentencing hearing. The crux of his objection is that because there is no evidence that he himself clearly intended to use the card, the amount of loss should be limited to $500 per card pursuant to Application Note 3(F) to Guideline 2B1.1. That note states, "In a case involving any counterfeit access device or unauthorized access device, loss includes any unauthorized charges made with the counterfeit access device or unauthorized access device and shall not be less than $500 per access device." § 2B1.1, cmt. n. 3(F)(i).

The district court, however, found it of no importance that Alli did not intend to use the cards to their full limit or indeed at all. Rather, the court found that Alli sold the cards knowing they would be used for unlawful gain and concluded that Alli therefore had a reasonable expectation, if not knowledge, that the cards would be used to the fullest extent possible. This was enough, the court determined, to demonstrate intended loss.[6] We must therefore decide whether a loss that an offender knows will occur, or should reasonably expect to occur, as a direct result of

---

[6]At the sentencing hearing, the government agreed with Alli that there was no intended loss. The district court thus "[found] itself in the unusual position of coming up with a conclusion that is different from the one that both counsel agree to."

his offense counts as an "intended loss" for purposes of an enhancement under § 2B1.1.

The Guidelines define intended loss as "the pecuniary harm that was intended to result from the offense, [including] intended pecuniary harm that would have been impossible or unlikely to occur." § 2B1.1, cmt. n.3(A)(ii). The government bears the burden of proving intended loss by a preponderance of the evidence, although "a reasonable estimate of loss will suffice." United States v. Egemonye, 62 F.3d 425, 428-49 (1st Cir. 1995) (citing USSG § 2F1.1 cmt. n.8).[7] This circuit has not previously decided whether reasonably foreseeable loss qualifies as intended loss, and the approaches taken by other circuits vary. Compare United States v. Staples, 410 F.3d 484, 490 (8th Cir. 2005) ("Absent other evidence of the defendant's intent, the size of the maximum loss that a fraud could have caused is circumstantial evidence of the intended loss which satisfies the preponderance of the evidence standard.") with United States v. Sanders, 343 F.3d 511, 527 (5th Cir. 2003) ("[O]ur case law requires the government prove by a preponderance of the evidence that the defendant had the subjective intent to cause the loss."); United States v. Morrow, 177 F.3d 272, 301 (5th Cir. 1999) ("[W]e look to actual, not constructive, intent.").

---

[7] Section 2F1.1 was subsequently deleted from the Guidelines Manual and consolidated with § 2B1.1. See United States v. Burdi, 414 F.3d 216, 218 n.2 (1st Cir. 2005).

For our part, we think it sensible in this context to follow the common-law rule that a person is presumed to have generally intended the natural and probable consequences of his or her actions. See, e.g., United States v. Jacobs, 117 F.3d 82, 95 (2d Cir. 1997); cf. United States v. Fortier, 242 F.3d 1224, 1232-33 (10th Cir. 2001) (endorsing an increased sentence under the Guidelines for harms that were a reasonably foreseeable consequence of, although not directly caused by, a defendant's conduct). Thus, in cases like the present one where the defendant's criminal role was to convey stolen credit cards to someone else, "intended loss" includes "losses that might naturally and probably flow from" his unlawful conduct. Jacobs, 117 F.3d at 95. Although Alli never intended to be the ultimate user of the stolen cards and thus lacked intent to run up charges on the cards himself, he specifically intended to sell the cards to someone who was quite likely to do so. As the district court stated,

> [I]t's pretty clear that Mr. Alli was a participant in this scheme, he was well aware, obviously, of the fact that these individuals were using the card[s] for unlawful purposes and he was selling them the card[s], that was a further clue that these individuals were going to use the cards to the maximum extent permissible.

Alli was aware of the unlawful aims harbored by his customers in the Netherlands, was a knowing participant in their larger scheme, and specifically intended to sell them the stolen cards. It was naturally and probably to be expected as a result of Alli's actions

-8-

that those contacts would charge as much as possible on the cards. Accordingly, we find that the district court's attribution to Alli of intended loss totaling the stolen cards' aggregate credit limit of $88,500 was not clearly erroneous.

## B. Trafficking

The district court, again following the recommendation of the PSR, increased Alli's offense level by two points after determining that his offense involved "trafficking" of credit cards. The relevant guideline states: "If the offense involved . . . the production or trafficking of any unauthorized access device or counterfeit access device . . . increase by 2 levels." § 2B1.1(b)(9)(B). Alli contends that, in order to qualify as having engaged in "trafficking" within the meaning of this guideline, an offender must have violated the federal trafficking law, 18 U.S.C. § 1029(a). Alli was not charged with violating that statute. Furthermore, the statute requires that a defendant have obtained at least $1000 in value from his trafficking, see § 1029(a)(2); Alli contends that he has not met this threshold because he stood to gain only $150 for all the credit cards he planned to send to his contacts in the Netherlands. The government counters that, first of all, violation of § 1029(a) is not a prerequisite to the two-step enhancement, and, second of all, even if it were, Alli's conduct did violate that statute because he stood to gain more than $1000 in payments from the Netherlands-based purchasers. We

conclude that § 2B1.1(b)(9)(B) applies to offenders whose offense involves credit card trafficking whether or not that offense would also qualify as a violation of § 1029(a). Therefore, we find the enhancement proper without having to decide how much Alli was to be paid for sending the stolen credit cards to the Netherlands.

Nothing in § 2B1.1(b)(9)(B) requires the underlying offense to also be a violation of § 1029(a). The drafters of the guideline were clearly aware of the existence and relevance of § 1029(a), since the guideline's application notes incorporate certain specific definitions used in the statute. See § 2B1.1 cmt. n.8(A) (stating, e.g., that for purposes of § 2B1.1(b)(9), "counterfeit access device" has the meaning given that term in 18 U.S.C. § 1029(e)(2) and "unauthorized access device" has the meaning given that term in § 1029(e)(3)). We agree with the district court that "trafficking" sufficient to satisfy the guideline does not require a violation of the statute. Moreover, both the generally accepted definition of trafficking[8] and the statutory definition[9] are clearly satisfied here. Alli obtained control of stolen credit cards and attempted to sell them to his contacts in the Netherlands. Accordingly, he met the requirements

[8]One dictionary defines "traffic" as "the activity of exchanging commodities by bartering or buying and selling." Webster's Third New International Dictionary, Unabridged (1986).

[9]18 U.S.C. § 1029(e)(5) defines "trafficking" as to "transfer, or otherwise dispose of, to another, or obtain control of with intent to transfer or dispose of."

for the two-level increase and the district judge was correct to impose it.

## C. Reasonableness

Finally, Alli challenges his sentence as unreasonable. Sentences imposed under the advisory guidelines scheme in place after the Supreme Court's decision in United States v. Booker are subject to appellate review for reasonableness. Booker, 543 U.S. 220, 261 (2005); United States v. Robinson, 433 F.3d 31, 35 (1st Cir. 2005). A sentence is reviewable for reasonableness whether it falls inside or outside the now-advisory guidelines range. United States v. Jimenez-Beltre, 2006 WL 562154 at *2 (1st Cir. Mar. 9, 2006) (en banc). In selecting a sentence, a district court will ordinarily calculate the applicable Guidelines range and then determine "whether other factors identified by either side warrant an ultimate sentence above or below the guideline range." Id. at *3. The court is also bound to consider the sentencing factors set out in 18 U.S.C. § 3553(a).[10] Robinson, 433 F.3d at 35. Finally,

---

[10]These factors are:
  (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
  (2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training or medical care;
  (3) the kinds of sentences available;
  (4) the kinds of sentence and the sentencing range established by the Guidelines;
  (5) any pertinent policy statement;
  (6) the need to avoid unwarranted sentence disparities among

-11-

the court must, in most circumstances, explain its reasons for choosing the sentence it does. <u>Jimenez-Beltre</u>, 2006 WL 562154 at *3.

Here, the PSR proposed a guidelines sentencing range of 18 to 24 months. The district judge explained that he believed Alli's crime was not a crime of opportunity and that that fact pointed him toward the high end of the range, but because the government recommended a sentence at the low end of the range, he compromised by sentencing Alli to a mid-range sentence of 21 months.

Alli gives four reasons why the 21-month sentence is unreasonable. First, he cites the district court's allegedly faulty calculation of intended loss. Second, he claims the district court failed to adequately take into account Alli's personal characteristics and family situation. Third, he notes that the district court did not address the fact that Alli will likely be deported and separated from his wife and child. Finally, he argues that the 21-month period of incarceration is greater than necessary to achieve the statutory goals of punishment. <u>See</u> § 3553(a).

---

defendants with similar records who have been found guilty of similar conduct; and

    (7) the need to provide restitution to any victims of the offense.
18 U.S.C. § 3553(a).

The first claimed indicator of unreasonableness is easily disposed of: because we conclude that the district court did not clearly err in calculating the intended loss, we accordingly also conclude that relying on that calculation in choosing a sentence was not unreasonable. The second and third claimed indicators amount to a claim that the district court did not adequately consider, or perhaps did not adequately explain its consideration of, factors the defense viewed as mitigating. When reviewing a district court's consideration of a particular factor, "our emphasis . . . will be on the provision of a reasoned explanation, a plausible outcome and — where these criteria are met — some deference to different judgments by the district judges on the scene." Jimenez-Beltre, 2006 WL 562154 at *3. In this case, however, neither Alli nor his lawyer brought the personal circumstances invoked in this appeal — the illness of Alli's parents, his cooperation with law enforcement after his arrest, and the likelihood that he will be deported — to the attention of the judge at the sentencing hearing. Rather, when Alli was given the opportunity to speak at the hearing, he said simply, "I know I did something wrong, I'm sorry for what I did," and his counsel argued only the guidelines calculation objections discussed earlier.

The district judge's explanation of why the sentence he chose met the requirements of § 3553(a) was admittedly terse.

-13-

Except for the guidelines range, he discussed none of the § 3553(a) factors individually; instead, he simply stated,

> [T]his is one of those cases . . . where I think the guidelines produce a sentence that is reasonable and perfectly consistent with the factors enumerated in the statute, 3553(a). I think all of those factors have been adequately taken into account by the guidelines, and the guideline range, as I say, produces a reasonable sentence.

This language treads close to an assumption that the guideline sentence is automatically reasonable, an assumption that is no longer viable, see Jimenez-Beltre at *3, but we think that under the circumstances the district court acted reasonably in imposing the sentence it did. At the sentencing hearing Alli identified no factors (other than the challenges to the judge's guideline calculations already discussed) that would arguably militate in favor of a sentence below the guideline range of 18 to 24 months. Nor did the government raise any factors in support of an above-range sentence. In this situation, we do not fault the judge for not speaking further about the § 3553(a) factors, given that none were raised for his consideration and, in his independent judgment, none were worthy of further discussion.

The final contention on appeal is that Alli's sentence is unreasonable because it is longer than necessary to effectuate the statutory goals of criminal punishment. See 18 U.S.C. § 3553(a). The district judge did not discuss this statutory requirement. Again, however, we find the absence of particularized discussion

-14-

unproblematic given that the issue was not raised for the judge's consideration at the hearing.  In that context, the judge's general conclusion that the guidelines sentence was a reasonable punishment for Alli's crime suffices as a conclusion that the sentence was not longer than necessary.

## III.

For the reasons stated above, the defendant's sentence is **affirmed**.